**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re *Ex Parte* Application of Petronas Azerbaijan (Shah Deniz) S.à r.l and Petronas South Caucasus S.à r.l, pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings,<br><br>Petitioners. | Misc. Case No. M-_____ |

**MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

Baker & Hostetler LLP
Oren J. Warshavsky
Gonzalo S. Zeballos
J'Naia L. Boyd
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4200
owarshavsky@bakerlaw.com

*Attorneys for Petronas Azerbaijan (Shah Deniz)*
*S.à.r.l and Petronas South Caucasus S.à.r.l*

Dated: November 21, 2024

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND........................................................................................4

I.     HISTORICAL AND FACTUAL BACKGROUND .........................................4

II.    ENFORCEMENT OF THE FINAL AWARD IN LUXEMBOURG................9

III.   STAMPA IS HELD IN CONTEMPT OF THE SPANISH COURT ..............12

IV.   PETITIONERS' FIRST APPLICATION.......................................................12

V.    PETITIONERS INTEND TO FILE A CIVIL CLAIM AGAINST MR. STAMPA IN SPAIN FOR DAMAGES CAUSED BY THE SULU CLAIMANTS' ENFORCEMENT OF THE FINAL AWARD PURSUANT TO ARTICLE 1,902 OF THE SPANISH CIVIL CODE, AS FORESEEN IN ARTICLE 109.2 OF THE SPANISH CRIMINAL CODE .........................................................................13

VI.   CONTEMPLATED CIVIL CLAIMS AGAINST MR. COHEN, MS. MASON, CREMADES, THE SULU CLAIMANTS, AND/OR THE FUNDER PURSUANT TO ARTICLE 1,902 OF THE SPANISH CIVIL CODE ..........................16

VII.  CONTEMPLATED PRIVATE PROSECUTION AGAINST CERTAIN ATTORNEYS AT CREMADES INCLUDING MR. CREMADES, THE SULU CLAIMANTS, AND/OR THE FUNDER PURSUANT TO ARTICLES 556.1 AND 28 OF THE SPANISH CRIMINAL CODE...........................................17

VIII. CONTEMPLATED CIVIL ACTION IN LUXEMBOURG AGAINST THE SULU CLAIMANTS AND/OR THE FUNDER ON THE BASIS OF TORTIOUS LIABILITY.......................................................................................................19

IX.   DISCOVERY TO BE REQUESTED..............................................................23

ARGUMENT ..............................................................................................................31

X.    PETITIONERS SATISFY THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782................................................................................................................32

XI.   THE COURT SHOULD GRANT THE PROPOSED DISCOVERY ORDER................34

XII.  THE COURT SHOULD GRANT PETITIONERS' APPLICATION *EX PARTE* ..........37

CONCLUSION...........................................................................................................38

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
785 F. Supp. 2d 434 (S.D.N.Y. 2011) .......................................................................37

*In re Application of Gorsoan Ltd. and Gazprombank OJSC for an Order Pursuant
to 28 U.S.C. 1782 to Conduct Discovery for Use in a Foreign Proc.*,
No. 13 Misc. 397(PGG), 2014 WL 7232262 (S.D.N.Y. Dec. 10, 2014) ................................37

*In re Application of Hornbeam Corp.*,
No. 14 MISC. 424, 2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) .........................................37

*In re Ex Parte Application of Porsche Automobil Holding SE*,
15-mc-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ....................................35, 37

*In re Batbold*,
No. 21-MC-218 (RA) (OTW), 2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021),
*aff'd*, No. 21-MC-218 (RA) (OTW), 2023 WL 2088524 (S.D.N.Y. Feb. 17,
2023) ..................................................................................................................37

*In re Blue Skye Fin. Partners S.A.R.L.*,
22 Misc. 171 (KPF), 2022 WL 2441074 (S.D.N.Y. July 5, 2022) ...................................33, 36

*Brandi-Dohrn v. 1KB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) .......................................................................................32, 35

*In re Chevron Corp.*,
No. 10-mc-00002 (LAK) (S.D.N.Y. Aug. 6, 2010) ......................................................38

*In re CI Invs. Inc.*,
No. 23 Misc. 434 (GHW) (GS), 2023 WL 8643965 (S.D.N.Y. Dec. 14, 2023) ...................36

*In re del Valle Ruiz*,
939 F.3d 520 (2d Cir. 2019) .......................................................................................33

*In re Furstenberg Fin. SAS*,
785 F. App'x 882 (2d Cir. 2019) ...............................................................................34

*Goenechea v. Davidoff*,
Civil No. CCB-15-3384, 2016 WL 560689 (D. Md. Feb. 11, 2016) .................................36

*Intel Corp. v. Advanced Micro Devices, Inc.*,
542 U.S. 241 (2004) ...................................................................................33, 34, 35

*Lancaster Factoring Co. Ltd. v. Mangone.*
  90 F.3d 38 (2d Cir. 1996) .................................................32

*In re O'Keeffe*,
  646 F. App'x 263 (3d Cir. 2016) .......................................36

*In re Polygon Glob. Partners LLP*,
  21 Misc. 364 (ER), 2021 WL 5042733 (S.D.N.Y. Oct. 29, 2021) ........33

*In re Sarrio, S.A.*,
  119 F.3d 143 (2d Cir. 1997)..............................................33

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
  376 F.3d 79 (2d Cir. 2004)...............................................34

*In re Servicio Pan Americano de Proteccion*,
  354 F. Supp.2d 269 (S.D.N.Y. 2004).....................................36

## Statutes

28 U.S.C. § 1782 ................................................................. *passim*

28 U.S.C. § 1782(a) ......................................................32, 34, 35

Spanish Arbitration Act 60/2003 Article 15.4, of December 23, 2003 ...........6

Spanish Criminal Procedure Act Article 270.......................................17, 18

## Other Authorities

Hague Conference on Private International Law, Luxembourg Member Page,
  https://www.hcch.net/en/states/hcch-members/details1/?sid=51 (last visited
  November 20, 2024) .........................................................36

Hague Conference on Private International Law, Spain Member Page,
  https://www.hcch.net/en/states/hcch-members/details1/?sid=69 (last visited
  November 20, 2024) .........................................................36

S. Rep. No. 1580, 88th Cong., 2d Sess., 7 (1964) ...............................34

Petronas Azerbaijan (Shah Deniz) and Petronas South Caucasus (collectively, "**Luxcos**" or "**Petitioners**"), respectfully submit this memorandum of law in support of their application for an order, pursuant to 28 U.S.C. § 1782, to conduct discovery for use in aid of a foreign proceeding.[1]

## INTRODUCTION

Petitioners have been harmed in connection with enforcement efforts relating to certain rogue arbitration awards wrongfully obtained against the government of Malaysia. The underlying arbitration, the subject matter of which implicates issues relating to a long-standing territorial dispute between individuals who claim to be descendants of former regional sultanate (the Sultanate of Sulu), has been the subject of a considerable controversy from its inception to its shocking conclusion ("**Arbitration**"). The highly irregular final award in the Arbitration (the "**Final Award**"), which purported to redraw the Malaysian borders and subject the people of Malaysia to a debt comprising about 16% of Malaysia's annual budget, was rendered by a private Spanish commercial arbitrator. That arbitrator, though initially appointed by the Spanish court, had his appointment annulled shortly after the arbitration proceedings were commenced (by the same court). Notwithstanding that annulment, the arbitrator continued to assert his now non-existent authority as arbitrator and purported to move the seat of the Arbitration from Madrid, Spain, to Paris, France, where he—wrongly and without authority to do so—issued the

---

[1] This is the third application pursuant to 28 U.S.C. § 1782 filed by Petitioners in relation to the Foreign Proceedings (as defined herein). The first filing was made before Judge Hellerstein in this Court on May 28, 2024 (the "**First Application**"). *See In Re Petronas Azerbaijan (Shah Deniz) S.a.r.l et al.*, 1:24-mc-00242-AKH (S.D.N.Y. May 28, 2024), ECF No. 1. That application was granted. *Id.* at ECF No. 14. The second filing by Petitioners is being filed in the United States District Court for the District of Delaware concurrently to the filing of this application (i.e., it was also filed on November 21, 2024). This filing is made to obtain further evidence in support of the Foreign Proceedings from parties unknown to Petitioners as of the earlier filing, such that they could not be included in the earlier application.

Final Award which, among other things, mischaracterized the proceedings as a private commercial dispute.

This has had a very significant impact on Petitioners, non-parties to the Arbitration, who have incurred, and continue to incur, significant damages in seeking to set aside attachments which have been improperly levied over their bank accounts by the claimants in the Arbitration (the "**Sulu Claimants**"), which attachments have naturally disrupted Petitioners' operations more generally.  The Sulu Claimants have also threatened to enforce the improperly issued final award against the worldwide assets of the corporate group of which Petitioners are members, Petroliam Nasional Berhad ("**Petronas**"), a global Malaysian energy corporation.  Indeed, the Sulu Claimants have already sought to enforce the Final Award against Petitioners in Luxembourg, and have publicly stated that they will file suit in the other 169 countries in the world forthwith.  *See* Declaration of Gonzalo S. Zeballos dated November 21, 2024 (the "**Zeballos Decl.**") at ¶ 12.

A recent development in the case has been the criminal conviction of the arbitrator, Mr. Gonzalo Stampa ("**Mr. Stampa**" or the "**Arbitrator**"), in Spain for failure to follow the orders of a Spanish court—more specifically, for continuing to preside over the Arbitration even after the Spanish court's annulment of his appointment, which rendered void *ab initio* his authority to act as an arbitrator in these proceeding.  Mr. Stampa was sentenced to six months in prison.

Petitioners intend to pursue claims against certain parties in Spain and Luxembourg (collectively, the "**Foreign Proceedings**"). Specifically, Petitioners intend to pursue a civil claim against Mr. Stampa in Spain for damages arising from the harm incurred, and which continues to be incurred, by Petitioners as a result of the rogue Arbitration.  Petitioners also intend to bring a civil claim in Spain against the Sulu Claimants, their attorneys who include Mr. Paul Cohen

2

("**Mr. Cohen**"), Ms. Elisabeth Mason ("**Ms. Mason**"), and lawyers working at the Spanish law firm, B. Cremades y Asociados ("**Cremades**"), and the entity (or entities) funding and/or supporting the Sulu Claimants in the Arbitration and the present global enforcement proceedings (the "**Funder**"), which Petitioners reasonably believe to be special purpose vehicles or other entities related to the Therium Group of companies (of which, Therium Capital Management Ltd. ("**Therium**"), Therium Capital Management (USA) Inc. ("**Therium Capital**") are all members) (collectively, the "**Therium Group**")), for acting with willful negligence by purposefully ignoring the revocation of Mr. Stampa's authority as arbitrator by the Spanish courts prior to the issuance of the Final Award, and instead requesting Mr. Stampa to move the seat of the Arbitration from Madrid to Paris, away from the Spanish court's jurisdiction. Petitioners also intend to commence a private prosecution against Mr. Cohen, Ms. Mason, Cremades, the Sulu Claimants, and/or members of the Therium Group for inducing Mr. Stampa to commit the offence of disobedience.  Finally, Petitioners intend to pursue civil claims against the Sulu Claimants and members of the Therium Group in Luxembourg to recover the losses arising out of the Attachments (as defined below) brought against them in Luxembourg despite the Spanish courts having nullified Mr. Stampa's appointment as Arbitrator.

In connection with those actual and potential lawsuits, Petitioners seek discovery from A. Elizabeth Korchin ("Ms. Korchin"), Fiona Hill-Samuel ("Ms. Hill-Samuel"), and William H. Weisman ("Mr. Weisman") (collectively, the "Therium Employees"), all former employees of Therium Capital, as well as Barclays Bank PLC relating to: (1) any money transfers, whether direct or indirect, between or among any of the Therium Group and Mr. Stampa, the Sulu Claimants, and/or the Sulu Claimant's Attorneys; (2) any communications between or among any of the Therium Group and Mr. Stampa, the Sulu Claimants, and/or the Sulu Claimant's

Attorneys; and/or (3) the level of control and direction that the Therium Group has over the Sulu

Claimants' legal strategy including the Sulu Claimants' decision to initiate and maintain the

Attachments against Petitioners in Luxembourg.

**FACTUAL BACKGROUND**

This Petition arises in connection with a highly irregular final award issued by Mr.

Stampa, who emitted that decision after a ruling by a Spanish court annulling its prior

appointment of Mr. Stampa. The underlying dispute concerns a 19th century agreement relating

to certain territory located on the North Coast of Borneo, Malaysia (the "**Territory**" or

"**Sabah**"). Sabah, as it is now called, is part of the sovereign territory of Malaysia and has been

since September of 1963, when Sabah merged with Malaya, Sarawak and Singapore[2] to form

Malaysia.

**I.     HISTORICAL AND FACTUAL BACKGROUND**

On January 4, 1878, Sultan Mohammed Jamulul Alam (the "**Sultan of Sulu**") entered

into an agreement with Messrs. Alfred Dent and Baron Gustavus de Overbeck ("**Dent and**

**Overbeck**") for the cession of certain territory located on the North Coast of Borneo, Malaysia

(the "**Territory**" or "**Sabah**") ("**1878 Agreement**"). *See* Declaration of Fabio Trevisan dated

May 28, 2024,[3] a true and correct copy of which is attached as Exhibit C to the Zeballos Decl.

(the "**Trevisan Decl.**") at ¶ 7. Pursuant to the 1878 Agreement, Dent and Overbeck were

required to make an annual payment to the Sultan of Sulu equivalent to 5,000 Malaysian Ringgit

(approximately US$1,050 based on the exchange rate on 14 May 2024). *Id.*

---

[2] Singapore became an independent sovereign country in 1965.

[3] The Trevisan Declaration was filed in support of the First Application, which was premised on identical issues of fact and law to the present application.

Over time, the contracting parties to the 1878 Agreement changed.  Dent and Overbeck's position was transferred to the British North Borneo Company ("**BNBC**"), a British company. *Id.* at ¶ 8.  This development was confirmed when the Sultan of Sulu signed a confirmation deed with the BNBC in 1903.  *Id.*  Thereafter, in 1946, the British Crown replaced BNBC as a party to the 1878 Agreement.  *Id.*  In 1963, the Malaysian Government assumed responsibility for the annual payments when North Borneo became a state in the newly independent Malaysia.  *Id*.

Thereafter, the Malaysian Government made the annual payments to the Sulu Claimants until 2013, when it stopped doing so due to an armed incursion by militants calling themselves the "Royal Security Forces of the Sultanate of Sulu and North Borneo," who landed by boat in Sabah, Malaysia on February 11, 2013.  *Id.* at ¶ 9.  The professed goal of these militants was to assert a territorial claim to the Territory on behalf of the Philippines, based on its own claimed status as successor to the Sultanate of Sulu.  *Id.*  The clashes between the Malaysian security forces and the militants resulted in hundreds of injuries and 78 deaths.  *Id.*

In 2017, the Sulu Claimants—who are eight citizens of the Philippines claiming to be descendants of the Sultan of Sulu—sought to initiate a dispute resolution process against Malaysia for its failure to tender payment under the 1878 Agreement.  *Id*. at ¶ 10.  On April 28, 2017, the Sulu Claimants informed Malaysia that they intended to initiate arbitration proceedings in respect of the failure to tender payment under the 1878 Agreement.  *Id.* at ¶ 11.  Subsequently, on November 2, 2017, the Sulu Claimants sought to serve a preliminary notice of intention to commence arbitration on Malaysia at its embassy in Madrid, Spain.  *Id.*  Thereafter, the Sulu Claimants sought to commence an arbitration based on a clause in the 1878 Agreement which, they allege, provides that any dispute between the parties "will be brought for consideration or judgment of [the British Empire's] Consul-General in Brunei."  *Id.* at ¶ 12.  The meaning of that

clause, and its correct translation, remain issues of dispute between amongst others, the Sulu Claimants and Malaysia.  Trevisan Decl. at ¶ 12.  Because no British Consul-General in Brunei existed at that time (nor is such a person ever likely to exist again), and no replacement was ever agreed, the Sulu Claimants resorted to the British Foreign Office to settle the dispute, but it refused to do so.  *Id.*

On February 1, 2018, the Sulu Claimants initiated proceedings for the judicial appointment of an arbitrator before the Civil and Criminal Chamber of the Superior Court of Justice of Madrid (the "**Madrid High Court**") pursuant to Article 15.4 of the Spanish Arbitration Act 60/2003, of December 23, 2003.  *Id.* at ¶ 13.  On May 22, 2019, the Madrid High Court appointed Mr. Stampa as sole arbitrator in the Arbitration.  *Id.*  On May 31, 2019, Mr. Stampa accepted his appointment as the sole arbitrator in the Arbitration.  *Id.* at ¶ 14.  Shortly afterwards the arbitration proceedings between the Sulu Claimants and Malaysia formally commenced, with Mr. Stampa issuing Procedural Order No. 1 on June 24, 2019.  *Id.*

On May 25, 2020, Mr. Stampa issued a preliminary award (the "**Partial Award**") confirming, *inter alia*, his jurisdiction, Madrid as the seat of the arbitration, and the validity of the purported arbitration agreement.  *Id.* at ¶ 15.  He also ordered Malaysia to pay the full costs of the jurisdictional phase, including his fees, and the fees of counsel and the experts for the Sulu Claimants.  *Id.*

On June 20, 2020, the Sulu Claimants submitted their Memorandum of Request in which they detailed their claims on the merits in the Arbitration.  *Id. at* ¶ 16.  A hearing on the merits was held by video conference on February 15 and 16, 2021.  *Id*.  Upon request of Malaysia, on June 29, 2021, the Civil and Criminal Chamber of the Superior Court of Justice of Madrid annulled several earlier procedural decisions made by the Madrid High Court, including the

judicial appointment of Mr. Stampa as sole arbitrator in the Arbitration, which had the legal effect of rendering his appointment void *ab initio* and nullifying his historic and future actions in that capacity, including the already issued Partial Award and the eventual purported Final Award (the "**June 29, 2021 Judgment**").  *Id.* at 17 and Declaration of Pedro Soriano dated May 28, 2024,[4] at true and correct copy of which is attached as Exhibit B to the Zeballos Decl. (the "**Soriano Decl.**") at ¶ 14.

Thereafter, the Civil and Criminal Chamber of the Superior Court of Justice of Madrid, acting through its Law Clerk (*"Letrado de la Administración de Justicia"*), additionally ordered Mr. Stampa to immediately cease his activities as an arbitrator in two subsequent communications dated July 7 and July 12, 2021 (the "**July 2021 Communications**").  *See* Soriano Decl. ¶ 15.  However, and notwithstanding the June 29, 2021 Judgment and the subsequent July 2021 Communications, the Sulu Claimants filed an *ex parte* petition with the Tribunal de Grande Instance de Paris for recognition of the Partial Award, which granted the Sulu Claimants' request on September 29, 2021 (the "**French Exequatur**").  *Id.* at ¶ 16.  On October 29, 2021, and again notwithstanding the June 29, 2021 Judgment and the subsequent July 2021 Communications declaring void his appointment as Arbitrator, Mr. Stampa purported to transfer the seat of the arbitration from Madrid to Paris.  Trevisan Decl. at ¶ 20.

On December 10, 2021, Malaysia applied to the Paris Court of Appeal to set aside the French Exequatur.  *Id.* at ¶ 21.  On the same day, Malaysia requested that the First President of the Paris Court of Appeal suspend the French Exequatur pending its appeal and prohibit the Sulu Claimants from relying on it in the meantime (the "**French Exequatur Appeal**").  *Id.*  The First

---

[4] The Soriano Declaration was filed in support of the First Application, which was premised on identical issues of fact and law to the present application.

President of the Paris Court of Appeal subsequently suspended the French Exequatur on December 16, 2021. *Id.* at ¶ 22. However, that stay was lifted on June 10, 2022. *Id.*

On February 28, 2022, Mr. Stampa rendered a final award in Paris (the "**Final Award**"). *Id.* at ¶ 23. The Final Award ordered Malaysia to pay the restitution value of the rights over the allegedly leased territory along North Borneo under the 1878 Agreement and the 1903 confirmatory deed, with pre-award interest of 3.96% per annum, as of January 1, 2013, until 2044, and ordered Malaysia to pay to Claimants the amount of US$14.92 billion, an amount comprising about 16% of Malaysia's annual budget. *Id.* at ¶ 23 and Exhibit 3 thereto. The Final Award, which purported to redraw the Malaysian borders, is one of the largest arbitral awards in history. *Id.* at ¶ 23 and Exhibit 1 thereto. The Final Award also ordered Malaysia to pay 10% interest per annum on the US$14.92 billion awarded. *Id.* This is despite the fact that it does not seem from the Final Award that the Sulu Claimants sought this amount in their pleadings to the Arbitrator. *Id.*

On March 3, 2022, Malaysia initiated annulment proceedings against the Final Award with the Paris Court of Appeal (the "**French Annulment Application**"). *Id.* at ¶ 24. A stay of these proceedings was ordered, pending the decision of the French Cour de Cassation in relation to the French Exequatur Appeal. *Id.*

On June 6, 2023, the Paris Court of Appeal determined the French Exequatur Appeal and overturned the French Exequatur, finding that there was no enforceable arbitration agreement between the Sulu Claimants and Malaysia (the "**June 6, 2023 Decision**"). *Id.* at ¶ 25. On June 21, 2023, the Sulu Claimants filed a petition before the French Cour de Cassation, the French Court of final instance, to try to overturn this decision. *Id.* On November 6, 2024, the French Cour de Cassation upheld the June 6, 2023 Decision. Zeballos Decl. at ¶ 6.

On December 22, 2023, Mr. Stampa was found criminally liable for violating Article 556(1) of the Spanish Penal Code for "serious disobedience to authority" (i.e., contempt of court) by the judgment of Spanish Criminal Court No. 31 of Madrid (the "**Stampa Conviction**"). Trevisan Decl. at ¶ 26. On May 17, 2024, the Madrid Court of Appeal dismissed Mr. Stampa's appeal of the Stampa Conviction ("**Madrid Court of Appeal Decision**"). Soriano Decl. ¶ 23. Mr. Stampa has indicated that he will appeal the Madrid Court of Appeal Decision to the Spanish Supreme Court. *Id.*

## II.    ENFORCEMENT OF THE FINAL AWARD IN LUXEMBOURG

On May 18, 2022, following an *ex parte* petition, the Sulu Claimants obtained an order from the President of the District Court of Luxembourg confirming the recognition and enforceability of the Final Award in Luxembourg (the "**Luxembourg Exequatur**"). Trevisan Decl. at ¶ 27. On September 6, 2022, Malaysia challenged the Luxembourg Exequatur of the Final Award to the Luxembourg Court of Appeal. *Id.* This challenge is currently pending. *Id.*

Thereafter, on July 11, 2022, the Sulu Claimants served on nine banks an attachment on the assets owned by the Luxcos (the "**First Attachment**") within the banks' custody on the basis of the Awards. *Id.* at ¶ 28. The Luxcos were notified of the fact of this attachment by service of the First Attachment on July 15, 2022. *Id.* The First Attachment claims that the Luxcos are the alter egos of Malaysia, and accordingly, the Sulu Claimants are therefore entitled to enforce the Final Award against them. *Id.* However, the First Attachment does not contain any evidence which demonstrates that, as a matter of Luxembourgish law, the Luxcos are, in fact, the alter egos of Malaysia. *Id.*

On July 11, 2022, the Sulu Claimants also served on the Luxcos an attachment on the shares held by the Malaysian company Petronas Azerbaijan Upstream Sdn. BHD ("**PAUSB**") in the Luxcos, as well as any claim PAUSB may have against the Luxcos such as dividends and loan reimbursements (the "**First PAUSB Attachment**").  *Id.* at ¶ 29.

On September 7 and 8, 2022, the Luxcos filed proceedings in the District Court of Luxembourg ("**Luxembourg District Court**"), before a judge sitting in summary proceedings to obtain a withdrawal of the First Attachment (the "**Summary Proceedings**").  *Id.* at ¶ 30.  On January 24, 2023, the Luxembourg District Court, withdrew the First Attachment on the basis that the Sulu Claimants had not complied with Luxembourgish civil procedure, which required them to indicate their address of residence when applying for the First Attachment (the "**First Attachment Decision**").  *Id.*

On August 31, 2022, PAUSB filed proceedings in the Luxembourg District Court, before a judge sitting in summary proceedings to apply for the First PAUSB Attachment to be lifted. *Id.* at ¶ 31.  On January 24, 2023, the Luxembourg District Court withdrew the First PAUSB Attachment on the basis that the Sulu Claimants had not complied with Luxembourgish civil procedure, which required them to indicate their address of residence when applying for the First PAUSB Attachment (the "**First PAUSB Attachment Decision**").  *Id.*

Notwithstanding the Luxembourg District Court's decision to withdraw the First Attachment proceedings, the Sulu Claimants maintain their request to validate this First Attachment on the merits.  *Id.* at ¶ 32.  This approach is not legally viable as, according to the most recent case law, these proceedings became "without object" upon the First Attachment

Decision.[5]  *Id.*  The Sulu Claimants are therefore forcing the Luxcos to incur additional legal costs to defend themselves in these validation proceedings, despite the fact that, as a matter of Luxembourgish law, the proceedings lack a viable legal basis (i.e., there is no longer any attachment to validate).  *Id.*  The Sulu Claimants adopted the same strategy in respect of the First PAUSB Attachment.  *Id.* at ¶ 33.

On February 14, 2023, the Sulu Claimants served on seven banks a new attachment on the assets owned by the Luxcos (the "**Second Attachment**," and together with the First Attachment, the "**Attachments**"), again on the basis of the Awards.  *Id.* at ¶ 34.  The Sulu Claimants served on the Luxcos a new attachment on the shares held by PAUSB in the Luxcos as well any claim PAUSB may have against the Luxcos such as dividends and loan reimbursements (the "**Second PAUSB Attachment**"), again on the basis of the Awards.  *Id.* at ¶ 35.  The validation proceedings relating to the Second Attachment and the Second PAUSB Attachment are currently pending before the Luxembourg *Tribunal d'arrondissement*.  *Id.* at ¶ 36.

---

[5] This is confirmed in Civil Judgment 2024TALCH01/00158 as follows:

> In this case, the request for validation of the garnishment has therefore become moot, on the one hand, to the extent that an action for validation of a garnishment cannot revive a garnishment definitively cancelled by a previous court decision which has become res judicata (see below) (. . .)

Trevisan Decl. Ex. 9 at 24.

This is further confirmed in Civil Judgment 2024TALCH01/00041 as follows:

> To the extent that the attachment, the validation of which is the subject of these proceedings, no longer exists and therefore cannot be validated and that both the question of the exemption from seizure of the settlement accounts of [redacted] and that of the absence of order in the case of the party [redacted] have already been considered by the Court of Appeal, or indeed even the Court of Cassation, the defendant has yet to establish on which dispute a decision is still to be made by the court in the context of these proceedings.

Trevisan Decl. Ex. 10 at 9.

## III.    STAMPA IS HELD IN CONTEMPT OF THE SPANISH COURT

On December 22, 2023, Mr. Stampa was found criminally liable for violating Article

556(1) of the Spanish Penal Code for "serious disobedience to authority" (i.e., contempt of court)

by the judgment of Spanish Criminal Court No. 31 of Madrid.  Soriano Decl. at ¶ 22.  For the

Court's reference, it is worth noting the following excerpt of the Stampa Conviction:

> It is clear from all this that [Mr. Stampa] had not only ceased to have the status of
> arbitrator since the final court decision of 29 June 2021 was issued, but even that
> he had virtually never become one, due to the absolute dismissal of the appointment
> made at the time. What is relevant for the purposes of the charge of disobedience
> is that, from the defendant's perspective and in practice, the consequence of that
> dismissal could only be to put an immediate and complete end to the arbitration
> proceedings.

*Id.* at Ex. 5 thereto.

Mr. Stampa was given a sentence of six-months in prison over his decision to continue to

act as an arbitrator in the Arbitration even after the Civil and Criminal Chamber of the Superior

Court of Justice of Madrid had ordered and then twice communicated to him the annulment of

his appointment in June and July 2021.  *Id.* at ¶ 23.  On May 17, 2024, the Madrid Court of

Appeal dismissed Mr. Stampa's appeal of the Stampa Conviction. *Id.*  Mr. Stampa has indicated

that he will appeal the Madrid Court of Appeal Decision to the Spanish Supreme Court. *Id*

## IV.    PETITIONERS' FIRST APPLICATION

As noted above, this is the third application pursuant to 28 U.S.C. § 1782 filed by

Petitioners in relation to the Foreign Proceedings.  The First Application was made before Judge

Hellerstein in this Court on May 28, 2024.  *Id.* at ¶ 2.  Judge Hellerstein granted the First

Application on July 11, 2024.  *Id.* at ¶ 3.

Petitioners have obtained disclosures from the parties subpoenaed by the First

Application.  These disclosures indicate that Barclays operates bank accounts held by certain

entities within the Therium Group and/or acts as a correspondent bank for foreign banks which hold bank accounts for certain Therium Group entities. *Id.* at ¶6, n.1.

## V. PETITIONERS INTEND TO FILE A CIVIL CLAIM AGAINST MR. STAMPA IN SPAIN FOR DAMAGES CAUSED BY THE SULU CLAIMANTS' ENFORCEMENT OF THE FINAL AWARD PURSUANT TO ARTICLE 1,902 OF THE SPANISH CIVIL CODE, AS FORESEEN IN ARTICLE 109.2 OF THE SPANISH CRIMINAL CODE

If the Stampa Conviction becomes final (i.e., Mr. Stampa's appeal to the Spanish Supreme Court is denied), it entails that Mr. Stampa is liable to compensate all parties harmed by the crime for the damages caused, in accordance with the provisions of Article 1,902 of the Spanish Civil Code, as foreseen in Article 109.2 of the Spanish Criminal Code. *Id.* at ¶ 24.

Petitioners intend to file a civil claim against Mr. Stampa in the First Instance Courts of Madrid. *Id.* at ¶ 25. Mr. Stampa's civil liability will extend to all losses suffered by *any injured party* as a result of his criminal actions. *Id.* This includes not only the direct victims of his criminal acts, but any person who has suffered damages because of the crime. *Id.* Mr. Stampa's total liability to the victims of his criminal acts shall be determined at trial. *Id.* As noted above, the Sulu Claimants have enforced the Final Award against Petitioners in Luxembourg. *Id.* at ¶ 26. Petitioners have been, and continue to be, harmed by Mr. Stampa's acts due to the Attachments being pursued against them in Luxembourg. *Id.* at ¶ 27.

Articles 109 and 110 of the Spanish Criminal Code provide that even if the injured parties have not been a party to the criminal case, they retain their right to seek restitution, reparation or compensation. *Id.* at ¶ 28. Therefore, even though Petitioners did not appear in the criminal proceedings, they nevertheless have standing to bring a subsequent civil action based on Mr. Stampa's criminal conviction, subject to being final (i.e., that his appeal to the Spanish Supreme Court is rejected). *Id.*

A claim for civil liability arising from a criminal act can be exercised in the same criminal proceeding or in a separate civil one. *Id.* at ¶ 29 and Ex. 10 thereto. The civil action may not be brought, however, until the criminal judgment is final, such that the limitation period for the civil action will not commence until the criminal proceedings have been completed. *Id.* at ¶ 30. This means that the civil action cannot be brought until the Spanish Supreme Court rules on, or refuses to consider, Mr. Stampa's appeal. *Id.*

The deadline to file a civil action against Mr. Stampa, pursuant to Article 1,968 of the Spanish Civil Code, will be one year from the date the judgment is final, which under applicable law means that his final appeal has been adjudicated. *Id.* at ¶ 31. The contemplated civil claim by Petitioners against Mr. Stampa is based on Article 1,902 of the Spanish Civil Code, which regulates tort liability or non-contractual liability and allows claims for damages suffered as a result of an action or omission of one person towards another due to fault or negligence. *Id.* at ¶ 32.

In order to establish tort liability under Spanish law, a party must prove: (i) a tortious action or omission by a certain person; (ii) actual harm; and (iii) the existence of a causal link between the action or omission performed and the damage caused. *Id.* at ¶ 33. As set forth in judgment 1210/2008 of the Civil Section of the Spanish Supreme Court of December 19, 2008: "Non-contractual liability, which is the one that occurs in this case, as will be seen later, requires the concurrence of the three elements described in article 1902 [of the Civil Code], which are negligence, damage or causal relationship. Therefore, should one of them fail, the claim will fail, too." *Id.* and Ex. 11 thereto.

As to the first requirement, the act or omission must be willful or negligent. *Id.* at ¶ 34. Moreover, with regard to omission, it is only a source of liability if there is a special duty to act.

*Id.* With regard to the second requirement, damages have to be real, not potential, and final. *Id.* Finally, regarding the proof of the causal link, the plaintiff must prove the reality of the event attributable to the defendant from which the obligation to repair the damage caused arises. *Id.*

Any enforcement actions in respect of the Partial Award taken after the June 29, 2021 Judgment, which nullified Mr. Stampa's appointment as Arbitrator, and enforcement actions based on Mr. Stampa's issuance of the Final Award entered on February 28, 2022, are clearly unlawful and any losses suffered by Petitioners as the result of those actions can clearly be claimed against Mr. Stampa as a result. *Id.* at ¶ 35. In other words, under Spanish law, there is a sufficient causal link between Mr. Stampa's unlawful act of issuing the alleged Final Award and Petitioners' losses in Luxembourg as a result of the Sulu Claimants' attempts to enforce the illegal "Final Award" against them. *Id.*

As regards demonstrating that Petitioners have suffered "actual harm" from the enforcement of the Final Award, financial damages will be assessed by a Spanish court via direct evidence (e.g., invoices for legal fees) plus any damages caused by the effects of the seizures of Petitioners' assets such as management time costs. *Id.* at ¶ 36. As set forth above, Articles 109 and 110 of the Spanish Criminal Code state that perpetration of a deed defined as a criminal offence by law shall entail, pursuant to the provisions contained in the laws, a duty to repair the damages and losses caused thereby, and that said liability includes, among others, the compensation of material and moral damage. *Id.*

Mr. Stampa is also potentially liable for moral damages under Spanish law. *Id.* at ¶ 37. By way of an explanation of moral damages, Judgment 127/2002 of the Civil Section of the Supreme Court on February 20, 2002, stated that moral damages manifest themselves in

corporations by the loss of "prestige and moral esteem in the public concept" and are therefore, in principle, claimable.  *Id.*

## VI.    CONTEMPLATED CIVIL CLAIMS AGAINST MR. COHEN, MS. MASON, CREMADES, THE SULU CLAIMANTS, AND/OR THE FUNDER PURSUANT TO ARTICLE 1,902 OF THE SPANISH CIVIL CODE

Petitioners also intend to bring a civil action for tort liability under Article 1,902 of the Spanish Civil Code against the Sulu Claimants, their attorneys including Mr. Cohen, Ms. Mason, and/or Cremades, and/or the Funder, which would be filed jointly with the civil action against Mr. Stampa in the Madrid First Instance Court.  *Id.* at ¶ 38.

Liability for the claim arising under Article 1,902 of the Spanish Civil Code will be premised on a failure to act with the standard of diligence duly required following the June 29, 2021 Judgment, the legal effect of which decision on Mr. Stampa's prior and future authority as sole arbitrator in the Arbitration under Spanish law should have been clear and understood.[6]  *Id.* at ¶ 40.  That is particularly the case for one of the Sulu Claimants' attorneys, Mr. Cremades, as a highly experienced Spanish lawyer, and his law firm B. Cremades y Asociados.  *Id.*  Both Mr. Cremades and his law firm should have known of and understood the impact of the Stampa Annulment Decision.  *Id.*  Moreover, as Cremades, a Spanish law firm,[7] represented the Sulu Claimants in the Arbitration, it is inconceivable that the Sulu Claimants and the Funder, would

---

6 *See* Soriano Decl. ¶ 14 which explains the legal effects of the June 29, 2021 Judgment on Mr. Stampa's authority as Arbitrator.

7 Mr. Cremades describes his law firm as follows:

> Founded in 1969 in Madrid by Professor Bernardo M. Cremades, a world-renowned professional in the field of dispute resolution, B. Cremades & Asociados is a leading firm in international, commercial and investment arbitration.  It distinguishes itself as the first specialist arbitration practice in Spain as well as the first Spanish firm to participate in investor-State arbitration.

Soriano Decl. Ex. 13

not have been aware of the legal effects of the June 29, 2021 Judgment under Spanish law. *Id.* However, rather than complying with the June 29, 2021 Judgment, it appears that it was the Sulu Claimants, through their legal counsel (e.g., Cremades, Mr. Cohen, and Ms. Mason), that requested Mr. Stampa move the seat of the Arbitration from Madrid to Paris on October 11, 2021. *Id.* at ¶ 41.

The documentary evidence in support of the aforementioned claims, which is being sought by this Application, will be essential in order to establish that these prospective defendants were acting with willful negligence as to the consequences of the Stampa Annulment Decision, i.e., that they knew of the legal status of this Decision under Spanish law, and yet made a conscious decision to continue to participate in (and, in the case of the Funder, fund) the Arbitration, and even suggested that the seat of the Arbitration be moved from Madrid to Paris to evade the proper enforcement of the Stampa Annulment Decision by the Spanish courts. *Id.* at ¶ 42. The prospective defendants' knowledge and/or conduct will be demonstrated through contemporaneous documentary evidence such as instant messages, e-mails, attendance notes, and/or other documents. *Id.*

## VII. CONTEMPLATED PRIVATE PROSECUTION AGAINST CERTAIN ATTORNEYS AT CREMADES INCLUDING MR. CREMADES, THE SULU CLAIMANTS, AND/OR THE FUNDER PURSUANT TO ARTICLES 556.1 AND 28 OF THE SPANISH CRIMINAL CODE

Petitioners also intend to commence a private prosecution against Cremades, the Sulu Claimants, and/or the Funder for inducing an offence of disobedience pursuant to Articles 556.1 and 28 of the Spanish Criminal Code. *Id.* at ¶ 43. Article 28 of the Spanish Criminal Code establishes that those who directly induce others to commit a crime will also be considered perpetrators of that crime. *Id.* Article 270 of the Spanish Criminal Procedure Act permits a private foreign party to file a criminal complaint directly with an investigating judge of a

17

Criminal Court, who then, after assessing the compliant, initiates proceedings against the relevant individual(s).  *Id.*  Article 270 reads as follows:

> All Spanish citizens, whether or not they are aggrieved by the crime, may file a complaint, exercising the "actio popularis" provided for in article 101 of this Law.
>
> Foreigners may also file a complaint for crimes committed against their persons or property or the persons or property of their representatives, having previously complied with the provisions of article 280, if they are not included under the last paragraph of article 281.

*Id.* and Ex. 10 thereto.

In the present case, Petitioners intend to file a private prosecution claim with the Spanish Investigation Courts of Madrid seeking a judgment that Mr. Cremades, the Sulu Claimants, and/or the Funder (and possibly other individuals) breached Article 28 of the Spanish Criminal Code by inducing Mr. Stampa to disobey the June 29, 2021 Judgment (i.e., the decision that removed his authority as Arbitrator) by, amongst other actions, moving the seat of the Arbitration from Madrid to Paris.  *Id.* at ¶ 44.  The act of Mr. Stampa moving the Arbitration's seat from Madrid to Paris undoubtedly constitutes part of his criminal offence: it was in contempt of the Spanish court's June 29, 2021 Judgment and forms part of the reasoning behind the Stampa Conviction.[8]  *Id.*

---

8 This is confirmed in the Stampa Conviction as follows:

> When examining the evolution of the arbitration subsequent to the nullity order, as well as the defendant's final position in relation to it, it cannot go unnoticed that what really underlay his opposition to comply with the magistrates court's request had nothing to do with the wording of the provision's section of the court decision or with the formalities of the injunction, but rather with his position of drastic antagonism towards a decision of the Chamber that entailed the abandonment of the arbitration, which he was reluctant to renounce. He devoted a large part of the argumentation in procedural order no. 42 to explaining this disagreement, but *perhaps the best example of the defendant's determination to circumvent the effect of the judicial order at all costs was the declaration of Paris as the seat of arbitration in procedural order no. 44 . . . .* (emphasis added).

*Id.* at ¶ 44 and Ex. 5 thereto at 11.

18

This Application seeks documentary evidence that will establish the extent to which each of the prospective defendants may have incited Mr. Stampa to ignore the June 29, 2021 Judgment, their knowledge of the June 29, 2021 Judgment's legal effect, and what means the defendants (either in part or collectively) may have used to induce Mr. Stampa to ignore the Judgment and commit the offence of disobedience. *Id.* at ¶ 45. Therefore, given the irregularities associated with the Arbitration, Petitioners seek discovery into the quantum and nature of the dollar-denominated payments made to Mr. Stampa (all of which, it is to be inferred, were paid with funds provided by the Funder), which would have passed through the U.S. correspondent banking system, the records of which are found with Barclays. Petitioners also seek testimony from the Therium Employees who have knowledge of the events in question and could provide information concerning the payments made by the Therium Group to Mr. Stampa and non-privileged communications regarding the Therium Group's funding of the Sulu Claimants and/or their attorneys, and the Arbitration. The Therium Employees can be found in this District.

## VIII. CONTEMPLATED CIVIL ACTION IN LUXEMBOURG AGAINST THE SULU CLAIMANTS AND/OR THE FUNDER ON THE BASIS OF TORTIOUS LIABILITY

Tortious liability is provided for by Articles 1382 and 1383 of the Luxembourgish Civil Code, which read as follows:

> Art. 1382
> Any act of man that causes damage to others obliges the person by whose fault it occurred, to repair it.

> Art. 1383
> Everyone is responsible for any damage he has caused not only by his action, but also by his negligence, or by his carelessness.

Trevisan Decl. at ¶ 37.

Based on these legal provisions, three cumulative elements need to be met in order for a tortious claim to be successful in a Luxembourg court, i.e. (i) a tortious act, (ii) a damage and (iii) a causal link between the two.  *Id.* at ¶ 38.  Petitioners will be able to satisfy these three elements.  *Id.* at ¶ 39.

As regards the first element of the tortious claim, the tortious act:

a.    The Sulu Claimants initiated enforcement proceedings in Luxembourg on the basis of the Awards (*See id.* at Ex. 8 at ¶ 3), despite the fact that the June 29, 2021 Judgment of the Spanish courts nullified Mr. Stampa's appointment as Arbitrator. Soriano Decl. at ¶ 14.   The Sulu Claimants' decision to maintain the enforcement proceedings in Luxembourg is all the more remarkable following the Stampa Conviction, a decision which reiterated that Mr. Stampa had acted without authority following the June 29, 2021 Judgment.  *See id.* at ¶ 44.

b.    The Sulu Claimants sought to maximize the publicity of the First Attachment by providing non-public documents to the press.  In particular, on July 11, 2022, the Financial Times issued an article on the same day the First Attachments were served in Luxembourg when these attachments were not public.  Trevisan Decl. at ¶ 40(b) and Ex. 13 thereto; and

c.    The Sulu Claimants did not withdraw the validation proceedings in relation to the First Attachment despite the current case law.  *Id.* at ¶ 40(c).  The Sulu Claimants did not propose to stay either of the Attachments in Luxembourg after the June 6, 2023 Decision, considering that a judicial finding by an appellate court at the purported seat of the Arbitration had found there was no enforceable arbitration agreement has a clear impact on the validity, and consequently enforceability, of

the Final Award. *Id.*

These actions and omissions by the Sulu Claimants have caused Petitioners significant harm,

including, but not limited to, the substantial legal fees that they have incurred in Luxembourg to

defend themselves against the Attachments. *Id.* at ¶ 41.

The Funder has financed, and, it is understood, continues to finance, the Sulu Claimants'

claims against Malaysia, and the enforcement of the Awards, and has, accordingly to media

reports, committed very significant funds in this regard. *Id.* at ¶ 42. It therefore seems inevitable

that it will have been involved in directing the Sulu Claimants' enforcement strategy in

Luxembourg against the Luxcos. *Id.* Without the Funder's financial and strategic input, the Sulu

Claimants would not have been in a position to pursue the proceedings in Luxembourg and the

Luxcos would not have suffered the significant losses detailed above. *Id.*

For the sake of completeness, pursuant to Article 42 of the New Code of Civil

Proceedings, the Luxembourgish courts, in particular the Luxembourg *Tribunal

d'arrondissement*, would have jurisdiction to determine the claims identified above, as

Luxembourg is the place where the harmful event occurred. *Id.* at ¶ 43. Article 42 reads as

follows:

> In matters of compensation for damage caused by a crime or quasi-crime, the claim
> may be brought at the plaintiff's option, either before the court of the defendant's
> domicile or before that of the place where the harmful event occurred.

*Id.* and Ex. 15 attached thereto.

The documentary evidence sought pursuant to this application in support of this

contemplated claim will be essential in order to determine, amongst other things: (i) which entity

(or entities) within the Therium Group is supporting the Sulu Claimants; and (ii) the nature of

that entity's (or entities') involvement in directing the Sulu Claimants to act in a manner which

has caused Petitioners loss and damage as highlighted above.  *Id.* at ¶ 44.  As regards the point identified at point (i) in Trevisan Decl. at ¶ 43, the Therium Group appears to have offices in at least seven jurisdictions and investments across the world.  *Id.* at ¶ 45. The Therium Group also appears to have specific litigation funding vehicles.  *Id.*

Identification of the relevant Therium Group entity (or entities) involved in providing financial and strategic support to the Sulu Claimants is necessary before the contemplated Luxembourgish tort claim can be filed as Luxembourg procedural law (Article 153 of the New Code of Civil Procedure) requires the defendant to be clearly identified, which, in the case of a company, requires the precise Therium Group entity and its incorporation number to be indicated in the summons.  *Id.* at ¶ 46.

As regards the second element for establishing a tortious claim, the discovery sought will establish:

a.  Which entity(ies) or person(s) decided to initiate the Luxembourg enforcement proceedings against the Luxcos, a confirmation which, as noted above, is important for the contemplated tort claim to determine exactly who committed the tort, and who should be therefore incur liability for the damages incurred thereby; *Id.* at ¶ 47(a)

b.  Why this was the case, and, in particular, whether the prospective defendants were seeking to improperly and unlawfully pressure the Luxcos by freezing their assets through the Attachments (and maintaining such Attachments); *Id.* at ¶ 47(b)

c.  The reasons for such enforcement proceedings.  In particular, when and why the First Attachment proceedings were commenced despite Mr. Stampa's authority as

Arbitrator having been annulled by the Madrid High Court in the June 29, 2021

Judgment before the issuance of the purported Final Award, and then maintained

despite the summary withdrawal of the First Attachment; *Id.* at ¶ 47(c)

d.    The motivation behind maintaining the First Attachment despite the fact that it

was lifted by the First Attachment Decision and the clear legal position that the

validation of the First Attachment is unlikely to succeed in the circumstances; *Id.*

at ¶ 47(d); and

e.    The motivation behind launching and then maintaining the Second Attachment

despite the Paris Court of Appeal annulling the Exequatur for lack of a valid

arbitration agreement in the 1878 Agreement in the June 6, 2023 Decision.  *Id.* at

¶ 47(e).

The prospective defendants' knowledge and/or conduct will be demonstrated through

contemporaneous documentary evidence such as instant messages, e-mails, attendance notes,

and/or other documents.  *Id.* at ¶ 48.  Petitioners intend to use the materials obtained pursuant to

this application in support of the aforementioned civil claims as set forth above which shall be

commenced before the Luxembourg courts.  *Id.* at ¶ 49.

## IX.    DISCOVERY TO BE REQUESTED

Petitioners intends to seek disclosure from various entities acting as custodians of records

that could be relevant to its proposed civil and criminal actions against Mr. Stampa, the Funder,

the Sulu Claimants, and the Sulu Claimants' attorneys.

The targets of the proposed subpoenas, copies of which are attached to the *Ex Parte*

Application as Exhibits B–E are the following:

i.    Barclays Bank PLC

ii.    A. Elizabeth Korchin

   iii. Fiona Hill-Samuel

   iv. William H. Weisman

With respect to Barclays, Petitioners reasonably believe that a member of the Therium Group used one or more of them to facilitate payments to Mr. Stampa and/or Mr. Stampa used one or more of them to receive payments from a member of the Therium Group (this is because his fees and costs related to or connected with the Arbitration were dollar-denominated) (Trevisan Decl. at ¶¶ 15 and 23,), and in respect of subsequent enforcement efforts.

With respect to the Therium Employees, Petitioners reasonably believe that, based on their roles in Therium Capital during the relevant time period, these former employees have information and records concerning Therium Group's funding of the Sulu Claimants, its involvement in the Arbitration, subsequent attempts to enforce the Awards, the level of control and direction that the Therium Group has over the Sulu Claimants, the handling of dollar-denominated payments to Mr. Stampa, and the flow of documents and information among the members of the Therium Group, particularly with respect to the Arbitration and later enforcement attempts.  Specifically, Ms. Korchin was a Senior Investment Officer from July 2018 to April 2022; Ms. Hill-Samuel was a Business Operations Manager from November 2019 to October 2022; and Mr. Weisman was a Senior Investment Officer from June 2017 to May 2022.  Zeballos Decl. at ¶¶ 9–11.  The Therium Employees' roles indicate that they would have knowledge of these specific topics, and the information gathered from their deposition testimonies could be used in the Foreign Proceedings.

Petitioners will also demand production of the following materials, in the support of its anticipated and ongoing Foreign Proceedings: [9]

A.    As to Barclays:

1.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by any member of the Therium Group.

2.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by the Sulu Claimants.

3.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by the Sulu Sultanate.

4.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by Mr. Stampa.

5.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by Stampa Abogados.

6.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by Cremades.

7.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by Mr. Cohen.

8.    Documents sufficient to identify any bank accounts held by You belonging to or beneficially held by Ms. Mason.

9.    All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and the Sulu Claimants,

---

[9] Capitalized terms in this section are used as defined in the respective Subpoenas attached to the *Ex Parte* Application as Exhibits B–E.

including, but not limited to, any wire transactions where any or all of the individual Sulu Claimants is listed as the sender, originator, beneficiary or ultimate beneficiary.

10. All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and the Sulu Sultanate, including, but not limited to, any wire transactions where the Sulu Sultanate is listed as the sender, originator, beneficiary or ultimate beneficiary.

11. All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and Mr. Stampa, including, but not limited to, any wire transactions where Mr. Stampa is listed as the sender, originator, beneficiary or ultimate beneficiary.

12. All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and Stampa Abogados, including, but not limited to, any wire transactions where Stampa Abogados is listed as the sender, originator, beneficiary or ultimate beneficiary.

13. All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and Cremades, including, but not limited to, any wire transactions where Cremades is listed as the sender, originator, beneficiary or ultimate beneficiary.

14. All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and Mr. Cohen, including, but

not limited to, any wire transactions where Mr. Cohen is listed as the sender, originator, beneficiary or ultimate beneficiary.

15. All documents relating to any money transfers, whether direct or indirect, between any member of the Therium Group and Ms. Mason, including, but not limited to, any wire transactions where Ms. Mason is listed as the sender, originator, beneficiary or ultimate beneficiary.

16. All documents relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, all dollar-denominated transactions, between any bank accounts owned or controlled, either directly or indirectly, by any of the following parties: the Sulu Claimants; the Sulu Sultanate; Mr. Stampa; Stampa Abogados; Cremades; Mr. Cohen; and/or Ms. Mason.

B.    As to the Therium Employees:

1. Documents sufficient to identify any financial institutions holding bank accounts belonging to or beneficially held by the Therium Group.

2. All non-privileged documents and communications arising from, relating to, or in any way concerning, the Sulu Claimants and any of their alleged claims against Malaysia, the Arbitration, and/or the enforcement of the Awards including, but not limited to, the Therium Group's due diligence on, and financial support for, the Sulu Claimants and any of their alleged claims against Malaysia , the Sulu Claimants' filing of an *ex parte* petition with the Tribunal de Grande Instance de Paris for recognition of the Partial Award, and any steps taken subsequent to the petition being granted on September

29, 2021, and Mr. Stampa's purported reseating of the Arbitration from Madrid to Spain on October 11, 2021.

3.  All non-privileged documents and communications between You and the Sulu Claimants.

4.  All non-privileged documents and communications between You and the Sultanate of Sulu.

5.  All non-privileged documents and communications between You and Mr. Stampa.

6.  All non-privileged documents and communications between You and Stampa Abogados.

7.  All non-privileged documents and communications between You and Cremades.

8.  All non-privileged documents and communications between You and Mr. Cohen.

9.  All non-privileged documents and communications between You and Ms. Mason.

10. All non-privileged documents and communications: (1) between any of the following parties: the Therium Group; Sulu Claimants; the Sulu Sultanate; Mr. Stampa; Stampa Abogados; Mr. Cohen; Ms. Mason; and/or Cremades; or (2) concerning any communications between these parties.

11. All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions,

between any member of the Therium Group and the Sulu Claimants, including, but not limited to, any wire transactions where any or all of the individual Sulu Claimants is listed as the sender, originator, beneficiary or ultimate beneficiary.

12. All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any member of the Therium Group and the Sulu Sultanate, including, but not limited to, any wire transactions where any or all of the individual Sulu Sultanate is listed as the sender, originator, beneficiary or ultimate beneficiary.

13. All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any member of the Therium Group and Mr. Stampa, including, but not limited to, any wire transactions where Mr. Stampa is listed as the sender, originator, beneficiary or ultimate beneficiary.

14. All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any member of the Therium Group and Stampa Abogados, including, but not limited to, any wire transactions where Stampa Abogados is listed as the sender, originator, beneficiary or ultimate beneficiary.

29

15.  All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any member of the Therium Group and Cremades, including, but not limited to, any wire transactions where Cremades is listed as the sender, originator, beneficiary or ultimate beneficiary.

16.  All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any member of the Therium Group and Mr. Cohen, including but not limited to any wire transactions where Mr. Cohen is listed as the sender, originator, beneficiary or ultimate beneficiary.

17.  All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any member of the Therium Group and Ms. Mason, including but not limited to any wire transactions where Ms. Mason is listed as the sender, originator, beneficiary or ultimate beneficiary.

18.  All non-privileged documents and communications arising from, or relating to any money transfers, whether direct or indirect, or other transactions, including, but not limited to, any US-dollar denominated transactions, between any bank accounts owned or controlled, either directly or indirectly, by any of the following parties: the Sulu Claimants; the Sulu

Sultanate; Mr. Stampa; Stampa Abogados; Mr. Cohen; Ms. Mason; and/or Cremades.

19. All non-privileged documents and communications which evidence the extent the level of control and direction that the Therium Group has over the Sulu Claimants' legal strategy, including, but not limited to, the Sulu Claimants' decision to initiate and maintain the Attachments against Petitioners in Luxembourg.

20. Non-privileged documents and communications sufficient to demonstrate the manner in which documents and other information is shared between members of the Therium Group, including, but not limited to, the manner in which documents and other information is shared between: (1) Therium Group Holdings Limited; (2) Therium Capital Management (USA) Inc.; and (3) Therium Capital Management Ltd.

Petitioners intend to use the materials obtained through in the Foreign Proceedings as set forth above.

## **ARGUMENT**

Section 1782 of Title 28 of the United States Code permits the United States District Courts to grant discovery for use in a foreign proceeding. The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . The order may be made . . . upon the application of any interested person . . . .

28 U.S.C. § 1782(a). The goals of this statute are twofold: "to provide equitable and efficacious discovery procedures in the United States courts for the benefit of tribunals and litigants involved in litigation with international aspects . . . and to encourage foreign countries to provide similar

31

means of assistance to [United States] courts." *Lancaster Factoring Co. Ltd. v. Mangone.* 90

F.3d 38, 41 (2d Cir. 1996) (cleaned up).  "In pursuit of these twin goals, the section has, over the

years, been given increasingly broad applicability." *Id.* (cleaned up).

When a court finds that the statutory requirements of 28 U.S.C. § 1782 are met, it may, in

its discretion, grant an application for discovery.  The United States Supreme Court has

articulated a number of factors the district courts should consider when weighing an application

under Section 1782.  As set forth in greater detail below, all these discretionary factors weigh in

favor of granting Petitioners the requested discovery.

## X.  PETITIONERS SATISFY THE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782

Courts are authorized to grant an application made pursuant to 28 U.S.C. § 1782 where

"(1) the person from whom discovery is sought resides (or is found) in the district of the district

court to which the application is made, (2) the discovery is for use in a foreign proceeding before

a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any

interested person." *Brandi-Dohrn v. 1KB Deutsche Industriebank AG,* 673 F.3d 76, 80 (2d Cir.

2012).  Petitioners' application satisfies all three statutory requirements.

**First**, each third party from which Petitioners intend to procure discovery reside in or are

found in this District.  Specifically, upon information and belief, Barclays maintains an office in

this District, and Ms. Korchin, Ms. Hill-Samuel, and Mr. Weisman all are employed and

continuously transact business in this District and will be personally served with the subpoenas.

Zeballos Decl. at ¶¶ 8–11.  Therefore, each entity and individual to be subpoenaed resides and/or

can be found in the Southern District of New York within the meaning of the statute.  In *In re del

Valle Ruiz*, the Second Circuit held that the "resides or is found" language of § 1782 "extends to

the limits of personal jurisdiction consistent with due process."  939 F.3d 520, 528 (2d Cir.

2019).  An entity is deemed to be found in New York where it maintains offices.  *See id*. at 527-28.  Moreover, "tag jurisdiction" for individuals (served while physically present in the forum) is sufficient to satisfy § 1782's "found" requirement.  *Id.* at 527.

The petition thus meets the first statutory requirement.

**Second**, the discovery sought is for use in contemplated proceedings before a foreign tribunal.  The regularly constituted courts of Spain and Luxembourg are foreign tribunals within the meaning of the statute.  *In re Polygon Glob. Partners LLP*, 21 Misc. 364 (ER), 2021 WL 5042733, at *1 (S.D.N.Y. Oct. 29, 2021) (discussing application for discovery for use in High Court of Spain); *In re Sarrio, S.A.*, 119 F.3d 143, 144 (2d Cir. 1997) (remanding § 1782 filed in connection with Spanish litigation to district court); *In re Blue Skye Fin. Partners S.A.R.L.*, 22 Misc. 171 (KPF), 2022 WL 2441074, at *3 (S.D.N.Y. July 5, 2022) (granting application seeking discovery for use in the District Court of Luxembourg).

Petitioners' contemplated civil lawsuits satisfy the "for use" requirement of § 1782.  The statute's requirement of obtaining evidence "for use" in a foreign proceeding "does not limit the provision of judicial assistance to 'pending' adjudicative proceedings."  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004).  In fact, Congress specifically removed the word "pending" from the statute in 1964 to allow would-be litigants to gather evidence before proceedings—often necessary in civil code jurisdictions.  S. Rep. No. 1580, 88th Cong., 2d Sess., 7 (1964).  Actions reasonably contemplated at the time a petition is filed therefore meet the statute's "for use" requirement.  *See, e.g.*, *Intel Corp.* 542 U.S. at 259 (2004) ("[W]e hold that § 1782(a) requires only that a [proceeding] be within reasonable contemplation.")

Here, Petitioners have adduced the basis for their contemplated civil and private criminal claims to be filed before the Spanish courts.  *See* Zeballos Decl., exhibit B, at ¶ 4 (attaching

Soriano Decl. at ¶¶ 22–41). Petitioners reasonably expect that the documentary evidence sought will be used to support the civil claim to be filed before the Luxembourgish Courts. *See* Trevisan Decl. at ¶¶ 44 and 47. The petition thus meets the second statutory requirement.

**Third**, Petitioners are "interested persons" authorized to bring this application because they will be the Plaintiffs in the contemplated proceedings. The statutory term "interested person" encompasses both parties and contemplated parties to foreign litigation. *See also Intel Corp.*, 542 U.S. at 256. *See also In re Blue Skye Fin. Partners S.A.R.L.*, 2022 WL 2441074, at *3 ("Applicant is a litigant in the Luxembourg Actions and is therefore an 'interested person' for purposes of Section 1782"); *see also* 28 U.S.C. § 1782; *Intel*, 542 U.S. at 256 ("[t]he text of § 1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant'"); *In re Furstenberg Fin. SAS*, 785 F. App'x 882 at 885 (2d Cir. 2019) (concluding that petitioners intending to file a criminal complaint in Luxembourg were "interested persons").

For these reasons, Petitioners meet the three statutory requirements of Section 1782, and thus the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

## XI. THE COURT SHOULD GRANT THE PROPOSED DISCOVERY ORDER

"Once the statutory requirements [of 28 U.S.C. § 1782] are met, a district court is free to grant discovery in its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83–84 (2d Cir. 2004) (cleaned up). The Supreme Court has identified four factors that the district courts are to consider in ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign court to federal-court assistance; (3) whether the application conceals an attempt to circumvent foreign proof gathering restrictions of a foreign country; and (4) whether the application is

unduly intrusive or burdensome.  *See Intel*, 542 U.S. at 264–65; *Brandi-Dohrn*, 673 F.3d at 80–81.  Here, all of these factors weigh in favor of granting Petitioners' application.

First, where, as here, discovery is sought from entities and individuals that would not participate in the contemplated Foreign Proceedings, the need for court-ordered discovery is apparent.  As the Supreme Court explained, "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence.  In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."  *Intel Corp.*, 542 U.S. at 264 (internal citations omitted).  Neither Barclays nor the Therium Employees will be parties to the Foreign Proceedings.

The second discretionary factor identified by the Supreme Court—the nature of the foreign proceedings and the receptivity of the foreign tribunal to federal court assistance.  *Id.*  In considering this factor, "as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application."  *Brandi-Dohrn*, 673 F.3d at 82.  Courts should rather "heed only clear statements by foreign tribunals that they would reject Section 1782 assistance."  *In re Ex Parte Application of Porsche Automobil Holding SE*, 15-mc-417 (LAK), 2016 WL 702327, at *8 (S.D.N.Y. Feb. 18, 2016) (cleaned up).  The party opposing the petition bears the burden of demonstrating that a foreign court would not be receptive to assistance from a U.S. court.  *Id.*

Spanish and Luxembourgish courts are affirmatively receptive to evidence obtained with the aid of other countries; they are members of the Hague Convention on the Taking of Evidence

Abroad in Civil or Commercial Matters.[10]  Courts have determined that a country's foreign

tribunals are receptive to evidence obtained abroad where they are parties to the Hague

Convention on Evidence.  *See In re O'Keeffe*, 646 F. App'x 263, 267 (3d Cir. 2016) (so finding

regarding Hong Kong); *In re Servicio Pan Americano de Proteccion*, 354 F. Supp.2d 269, 274

(S.D.N.Y.2004) (same regarding Venezuela).  Federal district courts thus have granted petitions

in support of proceedings before courts in Spain and Luxembourg.  *See, e.g.*, *Goenechea v.

Davidoff*, Civil No. CCB-15-3384, 2016 WL 560689, at *3 (D. Md. Feb. 11, 2016) (granting

1782 petition where evidence was sought for use in contemplated claim before Madrid First

Instance Court); *In re Blue Skye Fin. Partners S.A.R.L.*, 22 Misc. 171 (KPF), 2022 WL 2441074,

at *3 (same as to the Luxembourg District Court).

      The third factor—whether the application is an attempt to circumvent any foreign proof-

gathering restrictions—also weighs in favor of granting discovery.  This does not require the

applicant to have first sought the requested discovery in the foreign tribunal; "courts may grant

Section 1782 applications even where the applicant did not first seek discovery in the foreign

tribunal . . . or where the information sought was not discoverable under the laws of the foreign

country at issue in the foreign proceeding."  *In re CI Invs. Inc.*, No. 23 Misc. 434 (GHW) (GS),

2023 WL 8643965, at *5 (S.D.N.Y. Dec. 14, 2023) (cleaned up).  Rather, "a court's analysis of

this factor hinges on whether a petitioner is pursuing discovery in bad faith."  *In re Batbold*, No.

21-MC-218 (RA) (OTW), 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021), *aff'd*, No. 21-MC-

218 (RA) (OTW), 2023 WL 2088524 (S.D.N.Y. Feb. 17, 2023).  As noted above, Petitioners

---

[10] *See* Hague Conference on Private International Law, Spain Member Page, https://www.hcch.net/en/states/hcch-members/details1/?sid=69 (last visited November 20, 2024); *see also* Hague Conference on Private International Law, Luxembourg Member Page, https://www.hcch.net/en/states/hcch-members/details1/?sid=51 (last visited November 20, 2024).

have no means to seek this discovery as it is in support of contemplated proceedings and from

entities outside the Spanish courts' jurisdiction and this petition reflects a sincere effort to

combat the Spanish courts' refusal to grant disclosure in these circumstances.  *See* Soriano Decl.

¶ 42.  The same is also true in Luxembourg.  *See* Trevisan Decl. at ¶¶ 50–52.

Finally, this application is not burdensome.  Bank records are routinely sought for and

obtained via § 1782 petitions.  *See, e.g.*, *In re Application of Hornbeam Corp.*, No. 14 MISC.

424, 2014 WL 8775453, at \*5 (S.D.N.Y. Dec. 24, 2014) (ordering production of bank records,

including wire transfers, pursuant to § 1782); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard*

*Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 437–39 (S.D.N.Y. 2011) (granting § 1782

petition seeking disclosure of account statements, account opening materials, customer files, and

due diligence materials). Further, deposition testimony is expressly permitted by Section 1782,

and Petitioners are not seeking any information that may violate a legally applicable privilege.

## XII.    THE COURT SHOULD GRANT PETITIONERS' APPLICATION *EX PARTE*

The Court should grant Petitioners' application ex parte.  Ex parte applications under 28

U.S.C. § 1782 are routinely granted.  See *In re Ex Parte Application of Porsche Automobile*

*Holding SE for an Ord. Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for*

*Use in Foreign Proc.*, No. 15-mc-417 (LAK), 2016 WL 702327, at \*5 (S.D.N.Y. Feb. 18, 2016);

*In re Application of Gorsoan Ltd. and Gazprombank OJSC for an Order Pursuant to 28 U.S.C.*

*1782 to Conduct Discovery for Use in a Foreign Proc.*, No. 13 Misc. 397(PGG), 2014 WL

7232262, at \*5 (S.D.N.Y. Dec. 10, 2014).  As noted by Judge Kaplan:

> Applications pursuant to 28 U.S.C. § 1782 are frequently granted *ex parte*.  Where,
> as here, the application is for the issuance of subpoenas, no substantial rights of the
> subpoenaed person are implicated by such action, as the subpoenaed person, once
> served, is entitled to move to quash or modify the subpoenas.

*In re Chevron Corp.,* No. 10-mc-00002 (LAK) (S.D.N.Y. Aug. 6, 2010), ECF No. 2.  Neither Barclays nor the Therium Employees will be prejudiced by granting Petitioners' application *ex parte* as they will have an opportunity to challenge the discovery Petitioners are seeking once it is served.

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court endorse the Proposed Order annexed to the *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings as Exhibit A, to serve the subpoenas attached to that Application as Exhibits [B–E].

Dated:  November 21, 2024
        New York, New York

**BAKER & HOSTETLER LLP**

*/s/ Oren J. Warshavsky*

Oren J. Warshavsky
owarshavsky@bakerlaw.com
Gonzalo S. Zeballos
gzeballos@bakerlaw.com
J'Naia L. Boyd
jlboyd@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201